## JACOBS et al. v. HYMAN et al.

(Circuit Court of Appeals, Fifth Circuit. January 17, 1923.)

No. 3869.

1. **Sales ⚖⇒2—Contract for purchase of cotton on New Orleans Exchange a Louisiana contract.**

A purchase of cotton by New Orleans brokers on the Cotton Exchange there on order by mail from a customer, for which margin was deposited in a New Orleans bank, was a Louisiana contract, and its legality is determined by the law of that state, without regard to the residence of the customer.

2. **Gaming ⚖⇒12—That purchase on exchange is intended as mere wagering contract must be known to both parties to invalidate it.**

A contract made by brokers for a customer for purchase of cotton on an exchange for future delivery, which under the rules of the exchange calls for actual delivery of the cotton and is valid under the laws of the state, is not rendered unlawful as a wagering contract because the customer did not intend an actual purchase, but merely to speculate on the rise and fall of the market, which intention was not disclosed or known to the brokers or the seller.

3. **Gaming ⚖⇒2—Contract of purchase on exchange for future delivery, to be performed in another state and there valid, held enforceable in federal court in Texas.**

The provisions of Pen. Code Tex. arts. 537, 539, do not prevent a court of the United States, sitting in Texas, from enforcing a contract of purchase for future delivery of cotton, made and to be performed in another State, valid under its laws, although contrary to these provisions of the Texas statute.

4. **Exchanges ⚖⇒4—Rule of exchange authorizing closing out of contracts when margins are exhausted not mandatory.**

Though the rules of the New Orleans Cotton Exchange authorize brokers to close transactions for purchase or sale for future delivery without notice when a customer's margins are exhausted, the rule is not mandatory, and where a customer has previously requested his brokers to protect a contract and sent additional margins, the brokers are justified in asking for more margins before closing out.

In Error to the District Court of the United States for the Austin Division of the Western District of Texas; Duval West, Judge.

Action at law by Alex Hyman and others, partners as Alex Hyman & Co., against Leon Jacobs and others, partners as the R. Jacobs Sons Company. Judgment for plaintiffs, and defendants bring error. Affirmed.

James H. Hart, of Austin, Tex. (Edward B. Coopwood, of Lockhart, Tex., and Victor L. Brooks and Dudley K. Woodward, Jr., both of Austin, Tex., on the brief), for plaintiffs in error.

L. Clyde Going, of Memphis, Tenn., and R. P. Ingrum, of San Antonio, Tex., for defendants in error.

Before WALKER, BRYAN, and KING, Circuit Judges.

KING, Circuit Judge. Alex Hyman and others, composing the partnership of Alex Hyman & Co., citizens of Louisiana (hereinafter styled plaintiffs), brought suit in the United States District Court for the

⚖⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Western District of Texas against Leon Jacobs and others, composing the partnership of R. Jacobs Sons Company, citizens of Texas (hereinafter styled defendants), to recover the sum of $3,960.40, with interest, a balance due for moneys advanced and paid out by plaintiffs for defendants on the purchase of 500 bales of cotton in December, 1918, for delivery in the following May.

On December 21st, 1918, defendants telegraphed plaintiffs to New Orleans, La., to buy for them, for delivery in May, 1919, 500 bales of cotton. Plaintiffs carried out such order and bought contracts for said cotton on the New Orleans Cotton Exchange. Defendants placed to the credit of plaintiffs in New Orleans $5,000 as a margin on said contracts. Cotton declining, on January 13, 1918, defendants wired plaintiffs: "Take care of us on our contracts and advise how much margin is necessary." Plaintiffs replied on the same date: "All right. Please deposit five thousand in bank and have bank confirm and remit." This was done by defendants.

On January 23, 1919, the market having further declined, plaintiffs wired defendants for an additional $5,000. Defendants replied, stating that when their margin was exhausted they understood that plaintiffs would sell out their account. Plaintiffs replied, calling attention to the telegram of January 13th, asking plaintiffs to take care of defendants and advise margin needed, and asked immediate reply. No reply was sent. Later in the same day, plaintiffs wired defendants that, unless an additional deposit of $5,000 was made before the close of the market, plaintiff would sell out defendants' contracts. No additional deposits were made and plaintiffs sold out said contracts. After crediting defendants' account with all credits, it showed a balance of $3,960.40.

The contracts for said cotton were purchased by said plaintiffs in their own name from several persons for delivery on the New Orleans Cotton Exchange, and provided for the delivery of such cotton subject to the by-laws, rules, and conditions of the New Orleans Cotton Exchange, and subject to United States Futures Act, § 5 (Comp. St. § 6309e). Said rules and conditions, among other things, stipulated that all orders for the purchase and sale of cotton were received and executed with the distinct understanding that actual delivery is contemplated in accordance with the requirements of the United States Cotton Futures Act (section 5), and that the party giving the orders so understands and agrees. A contract where such delivery was not contemplated was prohibited by another rule. On all marginal contracts the right was reserved to close transactions when margins were running out without further notice, and to settle contracts in accordance with the requirements of United States Cotton Futures Act, § 5, and the rules and customs of said Exchange.

In defense to said action, defendants pleaded that plaintiffs, who were members of the New Orleans Cotton Exchange, acting for defendants as brokers in said transaction, knew and had reasonable cause to know that said purchase of said future contracts was a mere speculation by defendants, in which they did not buy or intend to buy any bales of actual cotton, or to receive delivery thereof, and that the said transaction was merely a wager on the rise and fall of the cotton mar-

ket. They further pleaded that said contract to purchase said 500 bales of cotton, by and through the New Orleans Cotton Exchange, permitted such contract to be closed by delivery or tender of delivery of any grade of cotton other than the grade upon which the price was based in said contract, and at a price other than the actual price of spot deliveries of such grades at the time and place of such delivery or tender, which rendered said contract of purchase and sale in violation of articles 537 and 539 of the Penal Code of the state of Texas, making the same a wagering contract, the enforcement of which was contrary to the public policy of the state of Texas, and invalid and unenforceable in the courts sitting in Texas.

For a further defense, defendants pleaded that they made no further requests, after that of January 13, 1919, to the plaintiffs to take care of said contracts, and that under the rules, practice, and custom of the New Orleans Cotton Exchange, when the margins deposited against said contracts for purchase of said 500 bales had been exhausted, it was the duty of plaintiffs to sell out said contracts; that defendants relied upon the observance by plaintiffs of this duty, and that any further sums, advanced or paid by plaintiffs, were done voluntarily, without request from the defendants, or consideration to them, and plaintiffs cannot recover therefor.

No sufficient evidence was offered to show any intention on the part of plaintiffs, or of any person from whom they purchased said contracts, not to make a delivery of said cotton as called for by said contracts. At the conclusion of the testimony, the court directed a verdict in favor of the plaintiffs for the sum sued for.

[1] 1. The agreement for the purchase of this cotton and the purchase of said contracts was wholly a Louisiana contract. While the defendants resided in the state of Texas, the entire transaction was carried out in the state of Louisiana. Defendants employed the plaintiffs as their agents in New Orleans to purchase said contracts for May cotton. The contracts for such purchase were made there with persons in New Orleans. The deliveries called for by said contracts were to be made in New Orleans. The sums of money placed by defendants to the credit of plaintiffs were deposited, through a local bank in Texas, in a bank in New Orleans. The legality of the contract is therefore to be judged by the law of the state of Louisiana, of which this court takes judicial cognizance. Lamar v. Micou, 114 U. S. 223, 5 Sup. Ct. 857, 29 L. Ed. 94.

[2] The law of Louisiana in regard to transactions of this sort has been clearly stated by the Supreme Court of that state, and while, if under the guise of a contract for future delivery of an article, the real intention of both parties thereto is merely to speculate in the rise and fall of prices, and the delivery of the goods is not contemplated, but merely an adjustment upon the difference between the contract price and the market price of the goods at the date fixed for delivery in the contract, the transaction constitutes nothing more than a wager, nevertheless, "in order to affect the contract, the alleged illegal intent must have been mutual, and the intent of one party, not communicated to, or concurred in by the other, will not avail." Conner v. Robertson, 37

La. Ann. 814, 818 (55 Am. Rep. 521). That such contracts, in the absence of a purpose on the part of both parties thereto not to make delivery, are legal, has been repeatedly decided by the federal courts, and that one party may have had no intention of so performing, but expected or intended a mere adjustment of differences in price, will not invalidate it. Rountree v. Smith, 108 U. S. 269, 2 Sup. Ct. 630, 27 L. Ed. 722; Irwin v. Williar, 110 U. S. 499, 4 Sup. Ct. 160, 28 L. Ed. 225; Bibb v. Allen, 149 U. S. 481, 13 Sup. Ct. 950, 37 L. Ed. 819; Clews v. Jamieson, 182 U. S. 461, 21 Sup. Ct. 845, 45 L Ed. 1183; Bond v. Hume, 243 U. S. 15, 37 Sup. Ct. 366, 61 L. Ed. 565.

The present case on its facts is entirely unlike the case of James v. Clement, 223 Fed. 385, 138 C. C. A. 621. In that case the uncontradicted evidence showed that the brokers, who were suing for the balance claimed to be due to them on certain transactions, knew that the defendant did not intend to do anything except speculate on the rise or fall of the market and settle the differences in money. This court held that under such circumstances the defense that the transaction was a gambling arrangement was good. Here there is no proof in regard to the contracts entered into, except that they were entered into under the rules of the New Orleans Cotton Exchange without any such understanding. We therefore think that the transaction was valid under the law of force in Louisiana, by which law its legality is governed.

[3] 2. It is insisted, however, that although this contract is one made and to be executed in Louisiana, and valid under the laws of that state, it is one forbidden by the laws of Texas to be there made; that it is against the established public policy of that state, and therefore will not be enforced by a court sitting in the state of Texas. The statutes of Texas which it is asserted declare the illegality of such a contract, and which establish such a public policy of the state of Texas, are articles 539 and 543 of the Texas Penal Code, regulating dealings in futures.

These articles define futures or dealing in futures as (1) a sale or purchase, or contract or offer to sell or purchase, the articles named, to be delivered in the future, where it was not the bona fide intention of the party being prosecuted, at the time of such sale, purchase, contract, or offer, that the thing mentioned should be delivered and paid for as specified. (2) Any such sale, purchase, offer, or contract, where it was the intention of the party being prosecuted, at the time of making such contract or offer, that the same at the option of either party might be settled by paying or receiving a margin or profit on such contract. (3) Any purchase, sale, or offer, or contract for the sale or purchase of such articles by or through any exchange or board of trade, the rules, by-laws, or customs of which permit such contract or transaction to be settled, or closed, by delivery or tender of other grades of the thing mentioned therein than that upon which the price is based, at any price other than the actual price of spot delivery of such other grade, or grades, at the time and place of delivery or tender. Article 543 provides the penalty of fine and imprisonment for entering into such future contract.

We do not consider whether such statute renders a contract for future purchase of cotton, made in another state, valid at the place where made and to be performed, unenforceable in the United States courts sitting in Texas, because contrary to the established public policy of said state, an open question in this court. The case of Bond v. Hume, brought on writ of error to this court, involved the question whether a contract for the purchase or sale of cotton for future delivery on the New York Cotton Exchange, which was in every substantial particular identical with the contract here involved, should be denied enforcement, because repugnant to the established public policy of the state of Texas as shown by its statutes, especially the articles of the Penal Code above cited. This court certified to the Supreme Court of the United States this request for instructions:

"Where a contract between a citizen of the state of New York and a citizen of the state of Texas is entered into, made, and executed in the state of New York, for the sale of cotton for future delivery upon the New York Cotton Exchange, pursuant to the rules, regulations, customs, and usages of said Exchange, and the same is a valid exigible contract in the state of New York, does the statute of the state of Texas (known as the 'Bucket Shop Law') passed by the Thirtieth Legislature of the state of Texas in 1907, the same being incorporated in the Revised Criminal Statutes of Texas (1911) as chapter 3, pages 141, 142, or any public policy therein declared, prevent a District Court of the United States, sitting in Texas, wherein a suit is brought to recover for breach of said contract from granting such relief as otherwise, but for such statute, the parties would be entitled to have and receive?"

The court, after a full discussion of the entire case, held that similar contracts to those involved in the present case were valid under the New York law (substantially the same as that of Louisiana) and under the common law. Bond v. Hume, 243 U. S. 15, 22, 37 Sup. Ct. 366, 61 L. Ed. 565. Analyzing the statutes of the state of Texas, including the articles of the Penal Code above herein cited, the court concludes that the question propounded by the United States Circuit Court of Appeals for the Fifth Circuit must be answered in the negative, and that such statutes do not prevent the enforcement of a contract for the purchase of cotton for future delivery in another state, valid where made, in the courts of the United States sitting in Texas.

We have not found any decision of the United States Supreme Court in any way modifying the above decision, nor has any decision of the appellate courts of the state of Texas, holding adversely to the ruling made by the Supreme Court of the United States in the case of Bond v. Hume, been brought to our attention. We therefore conclude that the United States courts sitting in Texas have authority to enforce such a contract made and to be performed in the state of Louisiana and valid under the laws of that state. Bond v. Hume, 243 U. S. 15, 37 Sup. Ct. 366, 61 L. Ed. 565.

[4] 3. We do not think that the evidence in this case sustains the contention that plaintiffs were bound, whenever the defendants' margins were exhausted, to close out their contracts. While the rules of the New Orleans Cotton Exchange conferred such a right upon the broker, it did not make the exercise thereof mandatory, in the absence of instructions to this effect from his customer. In this case, when the

defendants thought their margins were exhausted on the 13th of January, they wired the plaintiffs, asking that they protect their contracts and notify them of the margins required. This was acceded to by the plaintiffs, and no further correspondence on this subject is shown to have passed between the parties until plaintiffs wired on January 23d for additional margins. We therefore think that the plaintiffs were justified, in the absence of further notice, in assuming that the defendants would desire their contracts protected on January 23d, and were justified in calling for additional margins on that day before closing them out. Plaintiffs acted with reasonable promptness in closing out said contracts after notice from the defendants that they would not put up additional margins.

The judgment of the District Court is therefore affirmed.